2023 IL App (2d) 200421U
No. 2-20-0421
Order filed March 1, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-999 |
| DANIEL A. FELICIANO, | ) ) ) | Honorable Robert Randall Wilt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hudson and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) The evidence was sufficient to prove that defendant constructively possessed a firearm in support of his conviction for being an armed habitual criminal; and (2) even if the State were required to prove that the false name defendant furnished to the police materially impeded their ascertainment of his identity, the evidence was sufficient to support defendant's conviction for obstructing identification. Therefore, we affirm.

¶ 2    After a jury trial in the circuit court of Winnebago County, defendant, Daniel A. Feliciano, was convicted for being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2016)) and obstructing identification (720 ILCS 5/31-4.5(a) (West 2016)).  He was sentenced to eight years'

imprisonment. On appeal, defendant challenges the sufficiency of the evidence of both convictions. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Before detailing the evidence and testimony adduced at trial, we describe the general area in which police responded on the night in question, as well as the location of the firearm that defendant was found to have constructively possessed for purposes of being an armed habitual criminal. The photographic evidence of the area and the officers' testimony demonstrate the following. Irving Avenue is a residential street in Rockford that runs in a north-south direction. 1107 Irving Avenue is a one-story single-family home located on the east side of the street. It is serviced by a driveway adjacent to the home on its south side, and it connects Irving Avenue to a garage that is located in the back yard, behind the home. Next door, to the south, is a similar sized one-story house, described as a "duplex," consisting of 1105 and 1103 Irving Avenue (the duplex or 1105). The two buildings are separated by a wooden privacy fence, which stretches from the back yards of the residences to the front portions of the residential structures. A walkway services the duplex and runs between the fence and the duplex. Thus, the pertinent features of the area appear in the following order, from north to south: the 1107 Irving Avenue residence, a driveway servicing 1107 Irving Avenue, the privacy fence, a narrow strip of grass along the south of the fence bordering a concrete walkway servicing the duplex, and the duplex itself. The firearm at issue in this case was found on the concrete walkway to the duplex, several feet east of the westernmost portion of the privacy fence. In other words, the firearm was found on the sidewalk on the north side of the duplex, between the fence and the duplex.

¶ 5      Four witnesses testified at trial, all of whom were officers with the Rockford police department. Officer Michael Edwards testified that on April 23, 2017, at approximately 9:50 p.m.,

he and his partner, Officer Bryce Davis, were dispatched to 1105 Irving Avenue in response to a report of a subject[1] armed with a firearm. They parked their marked police car just to the south of 1105 Irving Avenue and began walking north, toward 1107 Irving Avenue. Officer Edwards was wearing his patrol uniform. As they approached, Officer Edwards observed three males congregated in the front yard of 1107 Irving Avenue, later identified as defendant, Laqueint Cole, and Elijah Douglas. Defendant began to walk south, away from 1107 Irving Avenue, and Officer Edwards believed that he was going to run. Defendant walked toward the duplex, away from Irving Avenue and then toward the back yard area of the residences. Officer Edwards recalled that the fence was "between 1107 and 1105." He did not see Cole or Douglas leave to "go around to the back." Officer Edwards testified that he and Officer Davis ran behind a residence to cut off and look for defendant in back of the residences, but they lost sight of him. Officer Edwards could not "recall exactly where I ran" or which residence they ran behind. The area was dark and unlit. He was unable to "see well," but he testified he was able to recognize defendant when he encountered him moments later.

¶ 6    Officer Edwards further testified that he did not see anyone when he arrived in back of the residences, but he heard other police yell, "[g]et on the ground!" from the front of the residences, so he and Davis ran back to the front. He could not recall what route he took as he ran. Officer Edwards recounted that it took "a few seconds" to reach the front of the residences. When they reached the front, where the other responding officers were located, Cole and Douglas were being

---

[1] Although the call described a "white male with a black shirt," the trial court limited the prosecution to the term "subject." In his testimony, Officer Edwards described defendant as a white male wearing a black shirt, but the jury did not hear the 911 caller's description.

detained. Defendant was also present, but he was as yet not being detained. Officer Edwards recognized defendant as the individual who had walked away from 1107 moments earlier.

¶ 7    Officer Edwards testified that he then detained defendant. He placed defendant in handcuffs, patted him down, and recovered from defendant's right front pocket an unsealed plastic bag containing five live brass rounds of .38-caliber Winchester ammunition, which were admitted into evidence without objection. Officer Edwards asked defendant for his name, to which defendant replied, "Daniel Garcia." Officer Edwards ultimately learned defendant's true name after his partner, Officer Davis, "was able to do some research and was able to pull up a photo, a driver's license photo." The timeframe from Officer Edwards' arrival on the scene until he had contact with defendant was "[a] couple minutes, if that."

¶ 8    On cross-examination, Officer Edwards acknowledged that he did not conduct any fingerprinting or DNA testing on the bullets he recovered. He testified that defendant had not run, but only walked away. Officer Edwards also clarified that he observed defendant walk "south and then walked east along the duplex."

¶ 9    Officer Davis testified next, stating that, on the evening of April 23, 2017, he was dispatched to 1105 Irving Avenue following a report of a subject with a gun. He spoke with defendant at the scene. He asked defendant for his name, and defendant replied "Daniel Garcia." Officer Davis ran a search for that name with a date of birth of February 19, 1988, through the LEADS program, which is associated with the Secretary of State's office. He eventually discovered defendant's true name after he ran a search in LEADS for "Daniel Feliciano" with a date of birth of February 19, 1988. When Officer Davis ran that search, he got a "response back" that showed a standard identification photo from the Secretary of State's office. He identified defendant in court as the individual whose photo identification was displayed in the LEADS

system when he searched for Daniel Feliciano with a date of birth of February 19, 1988. Officer Davis was not asked whether or where he might have seen defendant in relation to the fence or the walkway.

¶ 10    Officer Kyle Parr testified that he was dispatched to 1105 Irving Avenue in response to a call regarding a subject with a gun. When he arrived, he observed several subjects standing in front of 1107 Irving Avenue. He approached, drew his service weapon, and "saw [defendant and Cole] walking southbound [from 1107 Irving Avenue] towards [the duplex]." Officer Parr testified that defendant rounded the south side of the fence, on the side of the duplex, beyond which his view of defendant was obscured. He also testified that Cole was "along the fence area" and went "into that fenced area between [the duplex] and the fence, on the walkway on the side of the duplex.

¶ 11    He also testified that Cole was "along the fence area" and went "into that fenced area between [the duplex] and the fence," and that Cole was "in or around the place where [Officer Parr later] saw the revolver." Officer Parr clarified on re-direct examination that Cole "never made it around that fence." After speaking with Cole, Officer Parr detained him in the front yard of 1107 Irving Avenue.

¶ 12    Officer Parr further testified that "a few moments" after defendant walked towards the duplex, he emerged from the walkway to the south of the privacy fence and presented himself to the officers in the front yard of 1107 Irving Avenue. Officer Parr estimated that "maybe 30 seconds" elapsed from the time he drew his service weapon to the time defendant returned to the front of 1107. Defendant walked in each direction and did not run.

¶ 13    After he detained Cole, Officer Parr "immediately" searched the area that defendant had walked to and reemerged from. There, lying on the concrete walkway south of the privacy fence, Officer Parr found a black Taurus Ultra-Lite .38-caliber revolver. "Probably two minutes" passed

from the time defendant went behind the fence until Officer Parr found the firearm. The firearm was loaded with five[2] live brass rounds of .38-caliber Winchester ammunition. Officer Parr testified that he knew the bullets were manufactured by Winchester because each round was branded on the base.[3] The revolver and its bullets were admitted into evidence and shown to the jury.

¶ 14 In addition to four photos of the firearm on the walkway, Officer Parr identified a photograph, taken during the daytime, depicting 1107 Irving and the duplex, viewed from Irving Avenue looking east. He marked where he initially observed defendant, the path that defendant traversed as Officer Parr approached the scene, and the path that defendant traveled when he returned to the front yard of 1107 Irving Avenue.

¶ 15 On cross examination, Officer Parr testified that it was possible to fit the revolver in the palm of his hand, which he demonstrated for the jury. Officer Parr also testified that he did not attempt to recover any fingerprints from the firearm or swab it for DNA. He further testified that he did not see defendant go to "that exact spot" where the firearm was found because he "lost visual around the fence," which had "obstructed [his] view." On redirect, Officer Parr stated that when defendant returned, "[h]e was coming back from that walkway I originally saw him go into."

¶ 16 The State's final witness was Officer Mark Castronovo. Officer Castronovo similarly testified that he was dispatched to 1105 Irving Avenue in response to a report of a subject with a gun. He parked his marked squad car "approximately three houses to the north" of 1105 Irving

---

[2] Nothing in the record specifies whether the revolver's capacity was five or six bullets.

[3] The trial court sustained a defense objection and precluded the prosecution from having Officer Parr compare the bullets found in the gun with the bullets found on defendant.

and approached on foot. He explained that "a large group" of officers arrived at approximately same time, and they exited their vehicles "on foot together for their safety," although he also said other police officers were already in front of 1107. As he approached, Castronovo observed three subjects "just standing there" on the southwest corner of the front yard of 1107 Irving Avenue. Defendant then "fled in an eastbound direction on foot," "through the yards," and Officer Castronovo lost sight of him.

¶ 17   When defendant fled, Cole and Douglas "were out front still." Officer Castronovo approached the two remaining subjects and instructed them to raise their hands. Douglas was located near a tree in front of 1107 Irving Avenue. Douglas initially complied with the verbal command to raise his hands, but he then lowered his hands and began to move toward the duplex. Officer Castronovo then tackled and detained Douglas in the driveway of 1107 Irving Avenue. Officer Castronovo testified that he was able to see Douglas from the time he got out of his squad car until he "made contact with him." Douglas "never made it past the driveway" at 1107 Irving Avenue and did not go behind the privacy fence. He further testified that the other individual, Cole, "was with *** Douglas[,] who remained. He did not flee." Neither Cole nor Douglas went behind the fence. Officer Castronovo searched Douglas and recovered a taser[4] from the front pouch of his sweatshirt. He did not find on Douglas a firearm or any firearm ammunition.

¶ 18   On cross-examination, Officer Castronovo testified that he did not "see [defendant] run to a fence," but rather, defendant ran[5] "eastbound in between 1107 [Irving Avenue] and the residence

_____

[4] The record contains no description of the taser.

[5] In his testimony, Officer Castronovo initially used the phrase "fled in an eastbound direction on foot," but then used or responded to "fled" several times without specifying whether defendant walked or ran. At the end of direct examination, the prosecutor used the term "ran," to

to the north, in between the two houses." Officer Castronovo lost sight of defendant. The next time he saw defendant was when defendant came back "along the south side of 1107 *** coming back down the driveway" of 1107 Irving Avenue. Officer Castronovo was unable to recall whether there were any vehicles in the driveway, but he stated that defendant returned "right to where the police officers were," and he returned using a different path than when he originally left the scene. When defendant reappeared, Officer Castronovo was "still engaged with *** Douglas," whom he was focused on at the time. He had no interaction with defendant at the scene.

¶ 19    The State rested, and defendant presented no evidence.

¶ 20    After closing arguments, the jury found defendant guilty on all four counts, namely being an armed habitual criminal, two counts of unlawful possession of a weapon by a felon, and obstructing identification. Defendant moved to set aside the verdict and for entry of a judgment notwithstanding the verdict or, alternatively, for a new trial. After a hearing, the circuit court denied the motion, and the case proceeded to a sentencing hearing. The court merged the counts of unlawful possession of a weapon by a felon into the armed habitual criminal count and sentenced defendant to eight years' imprisonment. Regarding the conviction for obstructing identification, the court stated that it would enter a judgment of conviction and imposed a statutory minimum fine of $75 pursuant to the Criminal and Traffic Assessment Act (705 ILCS 135/5-5 (West 2020)). Defendant moved to reconsider his sentence, which the court denied.

---

which defense counsel successfully objected. Shortly thereafter, on cross-examination, Officer Castronovo used "ran," after which both counsel began using "ran" and "run" in their questions concerning defendant's flight from the front of the residence. Officer Castronovo did not specify whether defendant was walking when he returned.

¶ 21 Defendant timely filed a notice of appeal.

¶ 22                                    II. ANALYSIS

¶ 23 On appeal, defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt of any of the offenses for which he was convicted. Concerning the firearm offenses, he contends that the State's evidence demonstrated only his presence in the general vicinity of the location of the weapon, which he correctly points out is, without more, insufficient to establish constructive possession. *People v. Sams*, 2013 IL App (1st) 121431, ¶ 13. In defendant's view, the State presented "only evidence of [defendant's] proximity," because it failed to present any evidence from which it could be inferred that he had knowledge that the firearm was present on the walkway next to the duplex. Moreover, he contends that the evidence was insufficient because the State offered no testimony from any witness who observed defendant hold the gun, did not exclude Douglas or Cole as being the true possessors of the firearm, and offered no DNA or fingerprint evidence to connect defendant to the firearm. Concerning the obstructing identification charge, defendant argues that the evidence was insufficient to support his conviction because the State did not offer any evidence that his furnishing of a false name to the officers materially impeded their investigation, which defendant maintains is an essential element of the offense. We address each issue, in turn.

¶ 24 When a defendant challenges the sufficiency of the evidence, the reviewing court must determine " 'whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Ortiz*, 2012 IL App (2d) 101261, ¶ 9 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). This standard applies to all criminal cases, regardless of

whether the evidence supporting the defendant's conviction is direct or circumstantial. *People v. Scott*, 2020 IL App (1st) 180200, ¶ 39.

¶ 25    While we must carefully examine the evidence, it is up to the trier of fact to determine the witnesses' credibility and the weight to be given to their testimony, to resolve any conflicts in the evidence, and to make reasonable inferences from the evidence. *People v. White*, 2017 IL App (1st) 142358, ¶ 14. "All reasonable inferences from the evidence must be allowed in favor of the State." *Scott*, 2020 IL App (1st) 180200, ¶ 39. In determining whether an inference is reasonable, the factfinder need not look for all possible explanations consistent with innocence or " 'be satisfied beyond a reasonable doubt as to each link in the chain of circumstances.' " *People v. Smith*, 2014 IL App (1st) 123094, ¶ 13 (quoting *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007)). Rather, it is sufficient if all of the evidence, taken as a whole, satisfies the trier of fact that the defendant is guilty beyond a reasonable doubt. *Smith*, 2014 IL App (1st) 123094, ¶ 13. It is not our role to retry the defendant, and we will not overturn a conviction unless the evidence is "so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt.' " *People v. Lloyd*, 2013 IL 113510, ¶ 42 (quoting *Collins*, 214 Ill. 2d at 217).

¶ 26    Here, defendant was convicted of being an armed habitual criminal. A person commits that offense if he or she knowingly possesses a firearm after having been twice convicted of certain prior felonies. 720 ILCS 5/24-1.7(a) (West 2016). Defendant was also convicted of unlawful possession of a weapon by a felon. A person commits that offense if he or she possesses a firearm or firearm ammunition after having previously been convicted of a felony. *Id.* § 24-1.1(a) (West 2016). Defendant does not contest that he has the requisite qualifying offenses. Rather, he argues that the State failed to prove that he constructively possessed the firearm.

¶ 27                              A. Constructive Possession

¶ 28    For purposes of these offenses, possession may be actual or constructive. *People v. Givens*, 237 Ill. 2d 311, 335 (2010).  "Actual possession is the exercise by the defendant of present personal dominion over the illicit material and exists when a person exercises immediate and exclusive dominion or control over the illicit material, but does not require present personal touching of the illicit material." *Id.*  Dominion may be shown where the defendant has the contraband on his body, or when he tries to conceal it or is seen throwing it away. *People v. Anderson*, 2018 IL App (4th) 160037 (citing *People v. Howard*, 29 Ill. App. 3d 387, 389 (1975)).  Proximity, alone, is insufficient to prove actual possession. *Id.*

¶ 29    In this case, because defendant was not in actual possession of the firearm and was not observed discarding it, the jury necessarily must have found that he constructively possessed it. See *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003) ("When a defendant is not found in actual possession, the State must prove constructive possession").  On appeal, the State appears to confine its argument to that of constructive possession.  Constructive possession "exists without actual personal present dominion over a chattel." *People v. Pittman*, 216 Ill. App. 3d 598, 603 (1991).  To establish that defendant had constructive possession of the firearm, the State had to prove beyond a reasonable doubt that defendant had (1) knowledge of the presence of the weapon; and (2) immediate and exclusive control over the area where the weapon was found. *People v. McIntyre*, 2011 IL App (2d) 100889, ¶ 16 (citing *People v. Hampton*, 358 Ill. App. 3d 1029, 1031 (2005)); *Sams*, 2013 IL App (1st) 121431, ¶ 10.  See also *People v. McBride*, 2020 IL App (2d) 170873, ¶ 39 ("A defendant has constructive possession of contraband when he or she lacks 'actual personal present dominion' over the contraband but nevertheless has 'an intent and capability to maintain control and dominion.' " (quoting *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992)).  "In deciding whether constructive possession has been shown, the trier of fact is entitled to rely on

reasonable inferences of knowledge and possession, absent other factors that might create a reasonable doubt as to the defendant's guilt." *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Evidence of constructive possession may be, and often is, entirely circumstantial. *People v. Faulkner*, 2017 IL App (1st) 132884, ¶ 39; *People v. Wright*, 2013 IL App (1st) 111803, ¶ 25. Knowledge and possession are questions of fact to be resolved by the trier of fact, which was the jury in this case. See *Faulkner*, 2017 IL App (1st) 132884, ¶ 39.

¶ 30                                   1. *Knowledge*

¶ 31    Knowledge, in the context of demonstrating constructive possession in a prosecution for being an armed habitual criminal, is rarely proven by direct evidence. Rather, it is established from the surrounding circumstances, including through "evidence of a defendant's acts, declarations, or conduct, from which it may be inferred that he knew of the firearm's presence." *Sams*, 2013 IL App (1st) 121431, ¶ 10; *People v. McLaurin*, 331 Ill. App. 3d 498, 502 (2002).

¶ 32    Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found that defendant had both knowledge of the firearm's presence and immediate access to the area where it was found, as the evidence establishes more than defendant's mere proximity to the weapon. Four officers of the Rockford police department responded to a call regarding a subject with a gun. The officers arrived at approximately the same time in marked police vehicles without their emergency lights activated, and they approached the residences on foot from Irving Avenue, some from the north of 1107, others from 1105 or south thereof. The officers all wore police uniforms, and at least one officer (Parr) had his service weapon drawn.

¶ 33    Defendant, Cole, and Douglas were congregated in the front yard of 1107 Irving Avenue. As the officers neared, defendant, alone, fled eastbound, away from the officers. Three of the responding officers—Edwards, Parr, and Castronovo—testified to observing defendant flee

eastbound. All three lost sight of defendant during his flight, but each stated that defendant reappeared moments later walking westbound towards the front of the residences. All agree that neither Cole nor Douglas rounded the fence, and that both remained in the front of 1107 Irving Avenue throughout the encounter. The gun in question was a small black Taurus Ultralight .38-caliber revolver loaded with five live brass bullets manufactured by Winchester. The gun was found on the concrete walkway immediately south of the privacy fence. The defendant was found to have in his right front pocket five live brass .38-caliber bullets manufactured by Winchester. No other subject was found to have a firearm or ammunition. Two of the three officers placed defendant in proximity to the location where the gun was found; none placed anyone else on the walkway or behind the fence.

¶ 34 Defendant emphasizes differences in the testimony of the officers concerning his location during the encounter. Two officers (Edwards and Parr) testified that they observed defendant retreating behind the privacy fence and thereafter re-emerging from the walkway there. The third officer (Castronovo) testified that defendant took a different path away from the scene, fleeing north of the 1107 residence and coming back via the driveway of 1107, which would place defendant north of the fence and away from the walkway where the gun was found.

¶ 35 Differences in testimony and the weight to attach thereto are within the province of the trier of fact. *People v. Kent*, 2020 IL (2d) 180887, ¶ 82. The jury could reasonably have credited the testimony of Officers Edwards and Parr in determining that defendant fled to the walkway behind the fence and discounted Officer Castronovo's memory. This would be reasonable considering that Officers Edwards and Parr were focused on apprehending defendant and set off running to cut him off behind the residences, observing him until their view was obstructed by the fence. Meanwhile, Officer Castronovo was focused on Douglas, whom he had to tackle and who

possessed a taser. Consistent with this considerable distraction, Officer Castronovo was unable to recall where his fellow officers were or whether there were cars in the driveway on which he said defendant returned (and on which he had tackled Douglas).

¶ 36    Defendant suggests that if Officer Castronovo's testimony is accepted, defendant did not retreat behind the fence where the gun was found. We reject defendant's invitation to reweigh the evidence. The jury was not required to accept Officer Castronovo's testimony regarding the path of defendant's flight, and any discrepancies in the officers' testimony was fully explored at trial. We may not substitute our judgment for that of the trier of fact as to witness credibility and the weight to be given to their testimony. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Defendant's immediate retreat from the officers arriving on scene, coupled with his reappearance moments later, created an inference from which a rational trier of fact could reasonably infer that defendant either hoped to avoid apprehension or attempted to conceal something. Defendant argues that his decision to walk away at that moment suggested only that he did not wish to speak with the police, which he maintains is not proscribed behavior absent an explicit instruction to stop. The jury was not required to accept defendant's competing inference as to the purpose of his flight, as the decision as to which inference to draw from the evidence belongs to the trier of fact. *People v. Green*, 339 Ill. App. 3d 443, 451-52 (2003). In any event, defendant's assertions that his flight from the officers was "not proscribed behavior absent explicit instructions to stop" is, in our view, preposterous under the circumstances. The officers' testimony demonstrates that, at the moment defendant decided to retreat behind the privacy fence, several officers, at least one of whom had a sidearm drawn, were converging on defendant's location from multiple directions. Faced with this show of force and display of official authority, no reasonable person in defendant's position would have believed he was free to leave. See *People v. White*, 2021 IL App (1st) 191095, ¶ 21

(explaining that, within the context of the Fourth Amendment, those protections are implicated when a reasonable person, under the totality of the circumstances, would not believe he or she was free to leave). Moreover, defendant's quick return to the officers' location undercuts his suggestion that he wished simply to avoid police interaction. He left the front yard for another purpose.

¶ 37 In addition to the undisputed fact of defendant's flight, the direction of the flight and the duration defendant was obscured behind the privacy fence further support the inference that defendant had knowledge of the gun. Officer Edwards testified that defendant "walked south [toward the duplex] and then east along the duplex." Officer Parr testified that he observed defendant, as well as Cole, begin to walk south from 1107 Irving Avenue towards the duplex, and that only defendant was able to round the south side of the fence, meaning on the duplex-side, before Officer Parr lost sight of him. According to Officer Parr, defendant reemerged from behind the fence "after a few moments" and presented himself to the officers. Although he did not see defendant go to the exact spot where the gun was found, Parr testified that defendant was behind the fence for "a few moments." We have reviewed the photograph that he marked upon to indicate where the weapon was found, and it appears that it was set on the walkway abutting the duplex only a matter of feet beyond the westernmost edge of the privacy fence at the front of the duplex. The jury could reasonably infer that, during the "few moments" that defendant concealed himself behind the fence, he traversed the walkway, placed the gun on it, and then returned to the front yard of 1107 Irving Avenue to present himself to the officers, divested of the gun. When defendant reappeared, Officers Parr and Castronovo were in the process of detaining Cole and Douglas, respectively, at 1107 Irving Avenue, and neither individual was found to possess a gun or any firearm ammunition (although Douglas possessed a taser). Defendant's decision to reappear

before the officers after having just left the scene lessened the inference that he hoped to avoid capture but made more likely the inference that he was attempting to conceal something.

¶ 38    Immediately after defendant returned to the front yard, Officer Edwards returned from the rear of the residences, detained defendant, searched him, and recovered five rounds of .38-caliber Winchester ammunition from defendant's right front pocket.  After Officer Parr finished detaining Cole, he searched for the firearm that formed the basis of the police dispatch.  He "immediately" walked to the fence behind which defendant concealed himself moments earlier and found the Taurus Ultra-Lite .38-caliber firearm on the walkway.  The firearm, which was small enough to fit within the palm of a hand, was loaded with five rounds of .38-caliber Winchester ammunition, which was the same make and caliber as the ammunition that was in defendant's pocket.  The State argues, and we agree, that it was reasonable for the jury to infer that defendant had knowledge of the firearm based on these circumstances.  See *Sams*, 2013 IL App (1st) 121431, ¶ 10 (stating that a defendant's knowledge of the firearm's presence may be proven through evidence of his or her acts, declarations, or conduct).

¶ 39    In reaching our conclusion, we are guided by *People v. Eghan*, 344 Ill. App. 3d 301 (2003).  There, the police were patrolling an apartment complex that was known for drug activity.  As they drove, they saw the defendant and another man "moving around" outside a vehicle in the parking lot.  *Id.* at 304.  One of the officers called out to the defendant by name and asked what he was doing, but the defendant, who was familiar with the officer, did not respond.  *Id.*  Instead, he walked toward a pickup truck that was parked on the opposite side of the parking lot.  As the officers approached on foot, the defendant walked behind the truck, paused for several seconds, and then came out from behind the truck and walked toward the officers.  One officer testified that, because of an incline in the terrain, he could see defendant "from the knees down" as he paused

behind the truck. Another officer, who was in his squad car when the defendant walked behind the truck, testified that he could see defendant's feet and ankles under the truck, and he appeared to "flex" his ankles and shift his weight to the ball of one of his feet. *Id.* at 305. As the defendant reemerged from behind the truck, an officer walked to the rear of the truck and found a plastic baggie of cocaine on the rear bumper. *Id.* The officer testified that the baggie "appeared to have a light moisture on the exterior" but, after assisting in arresting the defendant, the moisture had evaporated. No attempt was made to lift fingerprints from the baggie. *Id.*

¶ 40 On review, the appellate court concluded that the evidence was sufficient to support the defendant's conviction for unlawful possession of a controlled substance, notwithstanding the fact that no officer observed the defendant personally touch the baggie of cocaine. It reasoned that the circumstantial evidence supported a reasonable inference that defendant possessed the baggie when the police approached him, and that he attempted to conceal it on the rear bumper before it was discovered. *Id.* at 307. In support, the court emphasized that: (1) the defendant walked away from the officers when they told him to stop and proceeded to the other side of the parking lot, (2) the defendant was observed walking to the spot where the cocaine was found and paused there for several seconds whilst shifting his weight to one foot, (3) only defendant was observed in the area where the cocaine was found, and (4) the baggie was covered with moisture when it was discovered. *Id.* at 307-08.

¶ 41 Like the defendant in *Eghan*, defendant acted evasively by walking away from the police officers as they approached and hid himself for a few moments in a place that obscured the officers' views before remerging and presenting himself to them. Of the individuals gathered in the front yard of 1107 Irving Avenue, only defendant was seen retreating to the immediate area of where the weapon was found, as neither Cole nor Douglas was able to round the fence. Officer

Castronovo tackled Douglas in the driveway of 1107 Irving Avenue, and he was able to maintain visual contact with him during their entire encounter. He further testified that, when defendant fled eastbound, Cole and Douglas "were out front still" and "did not flee." Officer Parr detained the other subject, Cole, who "never made it around that fence." Admittedly, the officers in *Eghan* had a better view of the defendant in that case because the defendant hid behind a truck, which left the lower portions of his legs visible to the police. The officers in *Eghan* were therefore able to observe the defendant pause and shift his weight to one foot at the "precise area" where the baggie of cocaine was found behind the truck. *Id*. at 307-08. Here, defendant hid behind a privacy fence which, by design, shields objects from view on the other side. Still, the evidence against defendant in this case was at least as strong as in *Eghan* because, although no officer directly observed defendant behind the privacy fence, the defendant's possession of ammunition that matched the ammunition loaded in the firearm was strong circumstantial evidence that defendant possessed the weapon when the officers approached him and that he knew of the firearm's location after he reemerged from behind the fence. The jury could reasonably infer from these circumstances that defendant knew of the firearm's presence on the walkway.

¶ 42 Defendant relies primarily on two cases in support of his argument that the evidence was insufficient to prove knowledge of the firearm, but both are distinguishable. In *Wright*, 2013 IL App (1st) 111803, the appellate court reversed the defendant's conviction of aggravated unlawful use of a weapon because the State failed to prove, for purposes of constructive possession, that he knowingly possessed the firearm in question. *Id*. ¶¶ 1, 26. The evidence demonstrated that, after several police officers entered a residence to execute a search warrant, the defendant (who did not reside at the address) and another individual ran toward the basement stairs. As they descended the stairs, the other suspect fell over the defendant, and they tumbled down the stairs into the

basement. *Id.* ¶ 7. The officer who gave chase observed a gun within inches of the other suspect's hand. *Id.* A second officer "announced there was another gun present," which was attributed to defendant. A third officer testified that, as he proceeded down the stairs, he saw defendant prone on the floor and observed the butt of "a gun protruding from underneath the 'center mass' or torso area of [the] defendant." *Id.* ¶ 10. The defendant's hands were "within the proximity of his torso," meaning the gun was inches from his hands. *Id.*

¶ 43 In holding that the State failed to prove that the defendant knowingly possessed the gun, the appellate court emphasized that, notwithstanding the fact that the defendant was observed literally on top of the weapon, no officer saw the gun in his hands or observed him make any actions that suggested he was discarding a gun.[6] There was also no testimony that defendant made any movement that indicated he had knowledge of the weapon. *Id.* Further, there was no physical evidence linking the defendant to the gun, and three other individuals were present in the basement when the defendant and the other suspect tumbled down the stairs. *Id.* In short, there was no evidence, other than his proximity to the gun, that defendant had knowledge of the weapon. The *Wright* court continued that, even if the State proved the defendant had knowledge of the firearm, it would have been unable to establish that he exercised immediate and exclusive control over the basement because he did not live at the residence and three other people were already in the basement when the defendant and the other suspect fell. *Id.*

---

[6] As we recently noted in an unpublished disposition, "[s]uch evidence relates to actual possession, but the *Wright* court cited its absence as grounds for reversing a finding of constructive possession." *People v. Harris*, 2020 IL App (2d) 170603-U, ¶ 38.

¶ 44 Unlike in *Wright*, here, no other individuals were present in the immediate location where defendant retreated to and where the officers discovered the firearm. Although Cole and Douglas were in the same *general* area as the firearm when the police arrived, they both were detained in front of 1107 Irving Avenue and had no opportunity to retreat behind the privacy fence as defendant did. Officer Castronovo testified that, after defendant "fled in an eastbound direction," Cole and Douglas "were out front still," meaning the front yard of 1107 Irving Avenue, and they never went behind the privacy fence. He testified that, although Douglas initially complied with the officers' command to raise his hands, he soon lowered them and began to move toward the duplex. Upon seeing Douglas' movement, Officer Castronovo tackled him in the driveway of 1107 Irving Avenue, where he was detained. Douglas "never made it past the driveway." Officer Castronovo was able to see Douglas from the moment he exited his cruiser until he tackled him.

¶ 45 The other subject, Cole, was detained by Officer Parr. Officer Parr testified that, after he arrived on the scene and drew his service weapon, he observed defendant and Cole walk south from 1107 Irving Avenue toward the duplex, and that defendant was able to round the south side of the fence, at which point Officer Parr lost sight of him. Defendant stresses the officer's testimony that he saw Cole "along the fence area" and that Cole went "into that fenced area between [the duplex] and the fence," and he asserts that Cole therefore was "as close to the firearm's location as [defendant]." Defendant largely ignores Officer Parr's clarifying testimony on redirect examination that Cole "never made it around that fence" and that he detained Cole in front of 1107 Irving Avenue. In essence, defendant asks us to interpret the officer's testimony in a light most favorable to him. Because we are called upon to review the sufficiency of the evidence, however, the proper lens through which we must view the evidence is in a light most favorable to the State. *Green*, 2017 IL App (1st) 152513, ¶ 102. To the extent Officer Parr's

testimony concerning Cole's location during the officers' approach was inconsistent, it was reasonable for the jury to resolve that inconsistency in the State's favor, especially in light of the corroborating evidence, such as Officer Parr's testimony that Cole did not go behind the fence and Officer Castronovo's similar testimony that Cole remained in front of 1107 Irving Avenue, "did not flee," and never went behind the privacy fence. Thus, no individual other than defendant was in the *immediate* area of the gun in the instant matter, unlike in *Wright*, where the defendant was one of at least five individuals in the basement and, more importantly, one of two individuals within inches of the firearm. The evidence in *Wright* implicated the defendant much to the same degree as the other suspect, who likewise tumbled down the stairs. Also unlike in *Wright*, defendant here physically possessed five bullets that were the same make and caliber as the five bullets that were loaded in the firearm recovered by police, which is a strong indication that the weapon belonged to him. Defendant also provided the officers a fictitious name upon his arrest, which suggests consciousness of guilt. See *People v. Aguilar*, 396 Ill. App. 3d 43, 55 (2009) (stating that evidence of flight and providing the police with a fictitious name may be admissible as proof of consciousness of guilt).

¶ 46     *Sams*, 2013 IL App (1st) 121431, is also distinguishable. There, the police responded to two 911 calls, one of which stated that the defendant had pointed a gun at her son. *Id.* ¶ 4. The caller did not specify whether she observed the defendant point the gun or if she heard this information secondhand. *Id.* An officer testified that, upon his arrival at the house, he observed a man crying and a woman screaming in the driveway. As he spoke to them, the defendant exited the residence and was arrested. *Id.* ¶ 5. The homeowner consented to a search, and a shotgun was found under the living room couch. No officer saw the defendant possess a gun. *Id.* ¶¶ 5-6. The appellate court reversed the defendant's conviction because the State failed to prove that he

constructively possessed the gun. *Id.* ¶ 11. It reasoned that the officers' testimony was insufficient to establish constructive possession because they did not see the defendant in the same room as the gun, their testimony showed "only that [the] defendant walked out of a house in which a gun was later found," and the defendant did not live at the house. *Id.* ¶¶ 13-14.

¶ 47    Unlike in *Sams*, the evidence in the instant case demonstrated more than defendant's mere proximity to the firearm. Rather, it showed that defendant retreated from the scene upon the officers presenting themselves with weapons drawn, that defendant concealed himself behind a privacy fence to the immediate area where the gun was later found, neither of the other suspects were able to round the fence, and defendant possessed ammunition that matched the make and caliber as was loaded in the recovered weapon. Defendant concedes that the five bullets found on his person were "broadly similar to those found in the gun." Here, the evidence reasonably demonstrated that defendant constructively possessed the firearm that was found in the immediate area where defendant—and only defendant—retreated.

¶ 48    Defendant similarly argues that perhaps a nearby resident left the gun in the preceding minutes, hours, or even days before the police arrived. While it is certainly *possible* that the firearm was haphazardly left by someone else in the area defendant retreated to, such a scenario is extraordinarily unlikely considering that defendant was there immediately prior to the gun being found and defendant possessed ammunition that matched the bullets in that gun. We also note that the gun was found in the open—on a concrete walkway which served as the only paved path for ingress and egress to the duplex, and the jury would have viewed with heavy skepticism the possibility that the gun would have gone unnoticed in that location for any considerable amount of time. Again, in determining whether an inference is reasonable, the factfinder need not look for all possible explanations consistent with innocence or " 'be satisfied beyond a reasonable doubt as

to each link in the chain of circumstances.' " *Smith*, 2014 IL App (1st) 123094, ¶ 13 (quoting *Wheeler*, 226 Ill. 2d at 117). Instead, it is sufficient if all the circumstantial evidence satisfies the trier of fact beyond a reasonable doubt that defendant is guilty of the offense. *People v. Gomez*, 215 Ill. App. 3d 208, 216 (1991).

¶ 49 Finally, defendant emphasizes that the firearm was not tested for fingerprints or DNA. He cites no authority that such testing is required and, on the contrary, evidence of constructive possession is " 'often entirely circumstantial.' " *McCarter*, 339 Ill. App. 3d at 879 (quoting *McLaurin*, 331 Ill. App. 3d at 502). Although obtaining DNA and fingerprint samples would have undoubtedly strengthened the State's case, we cannot say that the absence of such evidence to corroborate the circumstantial evidence in this case creates reasonable doubt of defendant's guilt— especially in light of the fact that such evidence is often unrecoverable from such a weapon. Here, the jury reasonably inferred that defendant knew of the presence of the firearm based on defendant's initial flight from the police as they approached, the fact that the path he took led the officers directly to the firearm, defendant's relatively brief duration behind the fence (which was just enough time to place the firearm on the walkway), and the recovery of similar ammunition from defendant's pocket as compared to the rounds that were present in the firearm.

¶ 50                                     2. *Control*

¶ 51 Defendant next argues that the State failed to prove the second element of constructive possession, namely that he had exclusive and immediate control over the area in which the gun was found. This element, in addition to knowledge that the firearm was present, is required to establish constructive possession, because a "person's knowledge of the place or location of the [item] alleged to be possessed is not the equivalent of possession." *McIntyre*, 2011 IL App (2d) 100889, ¶ 17 (quoting *People v. Day*, 51 Ill. App. 3d 916, 917 (1977)). Control "may be shown

by evidence that defendant had the intent and capability to maintain control and dominion over the handgun, even if he lacked personal present dominion over it." *Anderson*, 2018 IL App (4th) 160037, ¶ 32. Defendant argues that the State presented no evidence that he exercised control over the walkway abutting the duplex, the duplex itself, or the fence that separated it from 1107 Irving Avenue. He also emphasizes the brief duration he was behind the fence, stating that he was behind it for "a matter of seconds before he walked away from the area," which he contends is an insufficient amount of time to establish or maintain exclusive and immediate control over an area.

¶ 52 The State responds that defendant's argument is misguided because exclusive and immediate control over the "area" in which contraband is found is unnecessary. Rather, it asserts that constructive possession can be proven if defendant once had physical control over the contraband, defendant had the intent to exercise control again and had not abandoned it, and no other person had obtained possession. See *People v. Moore*, 2015 IL App (1st) 140051, ¶ 23. In other words, the State argues that the evidence presented at trial established that defendant had exclusive and immediate control over the weapon itself. See also *Anderson*, 2018 IL App (4th) 160037, ¶ 32 ("[c]ontrol may be shown by evidence that defendant had the intent and capability to maintain control and dominion over the handgun, even if he lacked personal present dominion over it").

¶ 53 We agree with the State. As we noted in *Eghan*, proof that defendant had control over the premises where contraband is found is not a prerequisite to prove constructive possession. *Eghan*, 344 Ill. App. 3d at 308. In *People v. Adams*, 161 Ill. 2d 333, 344-45, our supreme court explained that a defendant in constructive possession of contraband need not have control over the premises where the contraband is found or even have actual, personal, present dominion over it. Instead, the State need only show that the defendant once had physical control over the contraband with

the intent to again exercise such control, he had not abandoned it, and no other individual had obtained possession. *Id.* at 345. "Therefore, proof that the defendant knew the [contraband was] present and exercised control over [it] establishes constructive possession." *Eghan*, 344 Ill. App. 3d at 308.

¶ 54    In this case, the evidence amply demonstrated that defendant had the intent and capability to control the firearm, as he walked behind the privacy fence immediately upon the arrival of the police and traversed the walkway abutting the duplex. Although the police did not observe defendant personally hold the firearm, the testimony established that it was dark outside, the area along the fence was not well lit, and the firearm was capable of being held within the palm of a hand. The circumstantial evidence, outlined earlier, reasonably supported the inference that defendant possessed the weapon on his person at the time the police approached him and that he attempted to conceal it behind the fence. These circumstances support an inference that defendant intended to exercise control over the firearm, and no reasonable argument could be made that he abandoned the weapon or that another person had obtained possession over it in the moments that defendant disappeared behind the fence and reappeared. Based on the evidence presented, a rational jury could have concluded that defendant had knowledge of the weapon and exercised control over it by placing it somewhere from which he could later retrieve it. Hiding contraband indicates an intent to exercise control over the item. *McLaurin*, 331 Ill. App. 3d at 502. See also *Adams*, 161 Ill. 2d at 334-45 (evidence of two individuals using a restroom on an aircraft where contraband was found was sufficient circumstantial evidence of possession).

¶ 55    In arguing that the State failed to prove that defendant had control sufficient to establish constructive possession, defendant primarily relies on *People v. Wise*, 2021 IL 125392. There, after a traffic stop and vehicle search, police found a firearm in a cupholder in the rear passenger

area of a minivan driven by defendant. *Wise*, 2021 IL 125392, ¶¶ 3-4. Three passengers were inside the vehicle: defendant driver, a front seat passenger, and a passenger in the " 'very back' rear passenger seat." *Id*. ¶ 3. An officer testified that defendant told him he was aware that there was a gun in the minivan, but he denied that the gun was his. At trial, an officer opined that the firearm was between five to ten feet away from the defendant's position in the driver's seat and it would not have been possible for him to reach it. *Id*. ¶ 7. He also testified that he did not think defendant owned the minivan. *Id*. The State presented no evidence as to the vehicle's owner or that the defendant had ever touched the weapon. On these facts, the court concluded that the evidence was insufficient to prove that the defendant possessed the firearm. *Id*.

¶ 56 *Wise* does not aid defendant's argument that the State failed to prove control. As the first district recently observed, *Wise* "did not hold that close proximity to the recovered weapon is required to prove constructive possession." *People v. Hines*, 2021 IL App (1st) 191378, ¶ 44. Rather, proximity is but one factor that courts consider in determining whether the defendant had immediate and exclusive control. *Id*. Defendant maintains that the weapon was "well outside his reach" at the time he was detained. While this is true, the argument overlooks the fact that defendant opted to distance himself from the weapon in the moments before his arrest by reappearing from behind the fence and presenting himself to the police. If defendant had been detained only a few moments sooner, prior to reemerging from behind the privacy fence, he would have been within a matter of feet of the weapon, or the weapon would have been within defendant's immediate reach. As discussed, the jury could have reasonably concluded that defendant exercised control over the weapon itself by stashing it in a place from which he could easily retrieve it later. For this reason, defendant's reliance on *Wright* as to the control element is similarly misplaced. Defendant had control over the weapon itself, notwithstanding his lack of personal present

dominion over it at the time of his arrest. Based on the above, a rational trier of fact could have found defendant guilty of being an armed habitual criminal.

¶ 57                                B. Obstructing Identification

¶ 58    The second issue raised on appeal is whether the State's evidence was sufficient to prove beyond a reasonable doubt that defendant committed the offense of obstructing identification under section 31-4.5 of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/31-4.5 (West 2016)). Defendant's posttrial motion raised no issue concerning his obstructing identification conviction. Ordinarily, a claim is forfeited when it is not raised contemporaneously at trial and specifically in a posttrial motion. *People v. Okoro*, 2022 IL App (1st) 201254, ¶ 50. However, defendant's argument that the State did not prove a necessary element of the offense is grounded in a challenge to the sufficiency of the evidence, and it is well established that a defendant may challenge the sufficiency of the evidence for the first time on appeal. *People v. Letcher*, 386 Ill. App. 3d 327, 330 (2008). Accordingly, notwithstanding the omission of the issue in defendant's posttrial motion, we proceed to the merits.

¶ 59    Section 31-4.5 of the Criminal Code provides:

"Obstructing identification.

(a) A person commits the offense of obstructing identification when he or she intentionally or knowingly furnishes a false or fictitious name, residence address, or date of birth to a peace officer who has:

(1) lawfully arrested the person;

(2) lawfully detained the person; or

(3) requested the information from a person that the peace officer has good cause to believe is a witness to a criminal offense.

(b) Sentence. Obstructing identification is a Class A misdemeanor." 720 ILCS 5/31-4.5 (West 2016).

¶ 60 Defendant neither disputes that he provided the officers with a false name at the scene, nor that he was lawfully detained when he furnished the false name. Rather, he asserts that his conviction must be reversed because the State "unequivocally failed to introduce any evidence" that the false name materially impeded the police investigation, which defendant argues is a necessary element of the offense. Defendant cites no case interpreting the obstructing identification statute. Instead, he relies on cases that pertain to other offenses under article 31 of the Criminal Code—namely *People v. Baskerville*, 2012 IL 111056, which concerned a prosecution under section 31-1(a) of the Criminal Code (720 ILCS 5/31-1(a) (West 2006)) for obstructing a peace officer, as well as *People v. Taylor*, 2012 IL App (2d) 110222, and *People v. Casler*, 2020 IL 125117, which involved prosecutions under section 31-4(a) for obstructing justice (720 ILCS 5/31-4 (West 2014)).

¶ 61 The State concedes that the offenses at issue in *Baskerville, Taylor*, and *Casler* were held to require proof of a material impediment relative to the object of the pertinent offenses. In other words, in the case of obstructing a peace officer under section 31-1(a), the conduct must materially impede or hinder the officer in the performance of his or her authorized duties. *Baskerville*, 2012 IL 111056, ¶ 29. Regarding the offense of obstructing justice under section 31-4(a), the prohibited conduct must constitute a material impediment to the administration of justice. *Casler*, 2020 IL 125117, ¶ 31. Nevertheless, the State maintains that obstructing identification under section 31-4.5, of which defendant was convicted, has no material impediment requirement and is distinct from the offenses at issue in *Baskerville, Taylor*, and *Casler*. In the State's view, the offense of obstructing identification was completed when defendant provided the officers with a false name

at a time when he was lawfully detained.  See *People v. Schronski*, 2014 IL App (3d) 120574, ¶ 23 (detained defendant providing a false name to authorities completes the offense).

¶ 62    We need not decide whether the obstructing identification statute includes a material impediment requirement because, even if it contains such a requirement, we would find that the evidence adduced at trial was sufficient to prove defendant guilty beyond a reasonable doubt.  As noted, section 31-4.5 prohibits a person from knowingly furnishing a false or fictitious name to a peace officer who has lawfully detained the person.  Based on a plain reading of the statute, and including the requirement of a material impediment requirement (which we assume only for purposes of evaluating defendant's argument), it is apparent that the statute was designed to deter certain persons from furnishing identifying information to peace officers that has the effect of actually impeding the officer's ascertainment of the person's identity.  See *People v. Comage*, 241 Ill. 2d 139, 150 (2011) (stating that, within the context of the obstructing justice statute, "a defendant who places evidence out of sight during an arrest or pursuit has 'concealed' the evidence *** if, in doing so, the defendant actually interferes with the administration of justice, *i.e.*, materially impedes the police officers' investigation").

¶ 63    Allowing all reasonable inferences from the record in favor of the State, as we must in a challenge to the sufficiency of the evidence, the evidence was sufficient to sustain defendant's conviction for obstructing identification.  Officer Davis testified that he spoke to defendant at the scene and, when he asked defendant for his name, he replied "Daniel Garcia," which defendant concedes was a false name.  Having received the false name, Officer Davis conducted a search through LEADS using the birthdate provided by defendant, but the search apparently returned no results.  Officer Davis "eventually" discovered defendant's true identity after he ran a search for "Daniel Feliciano," with a birthdate of February 19, 1988, which yielded a photo identification

that matched defendant. Officer Edwards did not learn defendant's identity until Officer Davis "was able to do some research and *** pull up a *** driver's license photo."

¶ 64 Critically, no officer testified that they knew or suspected defendant's true name when they asked him to identify himself, and the record does not suggest that any responding officer had previously encountered him. To the contrary, every officer testified that, when they first arrived on the scene, they observed several subjects congregated in the front yard of 1107 Irving Avenue, one of which they later learned was Daniel Feliciano. *Cf. Taylor*, 2012 IL App (2d) 110222, ¶¶ 17-18 (evidence was insufficient to sustain conviction of obstructing justice for furnishing a false name because, among other factors, the officer was "pretty sure" of the defendant's true name based on a prior arrest) and *Casler*, 2020 IL 125117, ¶¶ 9, 64-67 (reversing conviction for obstructing justice because evidence of a lack of material impediment was excluded where the officer recognized the defendant and recalled his name based on a prior arrest). See also *Baskerville*, 2012 IL 111056 (stating that, in the context of obstructing a peace officer under section 31-1(a), a false statement has legal significance if it was made in relation to an officer's authorized act and if the false information actually impeded that act).

¶ 65 Defendant argues that there was no material impediment to the ascertainment of his identity because the officers "immediately learned [defendant's] real name" and the "entire incident, from police arrival *** to the subsequent arrest, only took a 'couple minutes.'" A careful reading of the officers' testimony rebuts defendant's contentions. Defendant claims that the police learned defendant's true name "immediately" based on portions of testimony from Officers Edwards and Davis. However, Officer Edwards testified that he "ultimately learn[ed] his real name," and Officer Davis testified that he "eventually" discovered defendant's real name only after searching in LEADS. Neither officer testified that the discovery was immediate. The record also does not

support defendant's assertion that the "entire incident," up to and including the discovery of defendant's true name and defendant's arrest, "only took a 'couple minutes.' " Defendant cites Officer Edwards' testimony but, in fact, Officer Edwards' reference to a "couple minutes" pertained to "the time [he] arrived on the scene to the time [he] had contact with the defendant." The officers' testimony reflects at least some time passed between defendant's lie and the officers' ascertainment of the truth as the result of police research. Here, because no officer knew or even suspected defendant's true name at the time of his apprehension, and because police research was required to dispel the lie, defendant's intentional furnishing of a false name actually impeded the officers' ascertainment of defendant's identity, which was sufficient under the statute.

¶ 66                                III. CONCLUSION

¶ 67    For the above reasons, we affirm the judgment of the circuit court of Winnebago County.

¶ 68    Affirmed.